JOHN JACKSON v. THE STATE.

*No. 344.    Decided May 2.*

1.  **Robbery—Witness—Impeachment of an Acquitted Codefendant.**—On a trial for robbery, where appellant placed his acquitted codefendant upon the stand as a witness, and proposed to prove by him that he (the witness) had been tried and acquitted of the offense, which testimony, on objection by the State, was excluded, *Held*, error; it is clearly admissible to prove that a witness who has been charged with an infamous crime was acquitted thereof.

2.  **Impeachment of Witness by His Contradictory Evidence.**—Where portions of the written testimony of a witness have been introduced for the purpose of impeaching him, *Held*, that the whole of his evidence is admissible, if necessary to explain or throw light upon the portion used to discredit him.

3.  **Same.**—Where, for the purpose of impeaching a witness, the State introduced his testimony taken in the examining court, which evidence the witness denied was correct and denounced as false, stating that he had never read it, and that if it had been read over to him he would not have signed it, *Held*, the evidence was properly admitted for the purpose of contradicting his testimony, it being totally variant therefrom.

4.  **Defendant as a Witness—Impeachment of, by Proof that He is Charged With, or Has Committed, Other Crimes.**—A defendant testifying in his own behalf may be contradicted, impeached, and sustained in the same manner, and occupies the

·same place and is to be treated as other witnesses; and on cross-examination his credibility may be attacked by questions, and he may be made to answer whether or not he has been previously arrested for other crimes.  *Simkins, J., dissenting.*

5.  **Robbery—Charge—Deadly Weapons.**—On a trial for robbery, where it is not averred that deadly weapons were used in the commission of the crime, it is error ·for the court to charge the jury in relation to the use of such weapons.

APPEAL from the District Court of McLennan.    Tried below before ·Hon. S. R. SCOTT.

Appellant was jointly indicted with Ben Moore and Rufus Thompson for the robbery of one Charles Dick, and taking from his person . and possession by assault and violence the sum of $5.25.    It seems ·that Thompson had been previously tried and acquitted.    Appellant was alone placed upon trial in this prosecution, and the trial resulted in his conviction, with the punishment assessed at five years in the penitentiary.

The important testimony in the case is as follows:

Charley Dick, first witness for the State, being duly sworn, says: "My name is Charley Dick.    I live in Waco, Texas, and am a hack-driver.    I was living in Waco on the night of the 29th day of March, 1890.    I was then driving a hack for John Winfrey.    On that night, between 2 and 3 o'clock a. m., I drove my hack to the Congress saloon, then run by Joe Levy.    I got down and went into the saloon.    Hugh Cook was tending bar there.    I met Rufus Thompson, Ben Moore, and the defendant, John Jackson, in the saloon.    There were some other persons in the saloon; I do not know who they were.    I treated all three of the defendants, and threw my money on the counter.    I had $6.10 in my pocket.    The defendant, Rufus Thompson, and Ben Moore saw my money.    It was all in silver—dollars, halves, etc.    I staid in the saloon until about 3 o'clock, and then went from there to the Missouri, Kansas & Texas depot.    The south-bound train was late that night.    I staid at the depot about fifteen minutes and then drove up Eighth street to Austin, and down Austin street to the Winfrey livery stable. It was about half-past 3 or a little later when I reached the stable.    I drove into the stable; stopped on the south side of the elevator.    There was one gas light burning in the stable; it was on the right-hand side of the elevator as you go into the stable; there was only one light.    I had lights on my hack, and both were burning at the time.    The stable is on the north side of the public square and faces the south.    I got down, unharnessed my horses, and had already unharnessed one and was taking the harness off the second horse, when three men came out of the stall next to and south of the stall where I was taking the harness off the second horse.    I recognized Rufe Thompson, Ben Moore, and the defendant, John Jackson, as the men.    I was struck on both sides of the head; on the right side of the head first.    I was knocked senseless by the blows.    I was struck with something soft.    Ben Moore

and John Jackson struck me. I was unconscious for more than five weeks after that. I had $5.25 in my pocket when I was struck; it was worth $5.25. This was in McLennan County, Texas. My stalls were the last two stalls on the left-hand side of the stable, on north end of the stable. The horse I was unharnessing was facing the first stall west. I was on the right-hand side. The men came out of the stall on the left of the horse."

Cross-examination: "I had never seen Rufe Thompson or Ben Moore before I met them in the saloon on the night of the 29th of March, 1890. No one introduced them to me that night. I had seen John Jackson before; had known him sometime. The saloon is between Seventh and Eighth streets, on Austin street, five or six blocks from the stable. The Missouri, Kansas & Texas depot is about ten blocks from the stable. I remember testifying in the examining trial in this case before the justice of the peace. I did not testify in that trial, that 'I left Joe Levy's saloon about 4 o'clock and got to the stable about 4:30 o'clock.' The train got here about 4, and I came from the train by Joe Levy's saloon and got down for a few minutes, and then went to the stable. I do not know Charley Wimple, and I never told him on the 18th day of October, 1890, on North Fourth street, in Waco, Texas, about 10 o'clock a. m., that I did not know who struck me, and that I would not know Rufe Thompson if I was to meet him in the street. I never had any conversation with him about who struck me. I did not tell R. J. Goode, on the day of the examining trial in this cause, on Austin street, that I did not know who struck me, and that I did not know Rufe Thompson. I testified on the trial of Rufe Thompson on the 22d of November, 1893. I do not recollect what I testified to on that trial. It was not my business to remember what I testified to on that trial. I never saw Ben Moore, or Rufe Thompson either, before that night of the 29th of March, 1890. I do not remember testifying on the trial of Rufe Thompson that there were two gas lights burning in the stable when I was struck, but have since found out that there was only one."

John Winfrey, for the State, testified: "I was running a livery stable on the north side of the square on March 29, 1890. Charley Dick was driving a hack for me at that time. I found him on the morning of the 30th of March lying in a stall, about three feet from the front of the stall. His pockets were turned wrong side out and no money was in them. His watch was not taken, but still in his pocket. He did not say anything, and I discovered that he was senseless. I took him up-stairs and sent for a doctor."

Cross-examination: "There was only one light burning in the stable on that night, an ordinary gas-light. It was situated on the right-hand side of the elevator as you go in, about sixty or eighty feet from where Charley Dick was lying. The light was very dim back where Charley

was lying. The lights on a hack do not give any light to speak of; they are only placed there so that you can tell the number of the hack."

Rufus Thompson, the first witness for defendant, being sworn, says: "My name is Rufus Thompson; I have lived in Waco about twenty-three years. I am a paper-hanger by trade. I was jointly indicted with the defendant in this case. [Here the defendant proposed to ask the witness if he had not been tried and acquitted, and the State having objected to the question, the court sustained the objection and the defendant excepted.] On the night that Charley Dick was robbed I was in O'Donnell's saloon about 12 o'clock and met Ben Moore there. We went from there to the St. Charles saloon, on Austin street, and then went to Joe Levy's saloon. I staid in the saloon all night. I went to sleep in the back end of the saloon and woke up when Joe Levy came on watch, about 5 o'clock a. m. I did not know Charley Dick at that time, and I did not see him that night at that saloon or anywhere else. I never saw John Jackson that night anywhere. I saw him about 6 o'clock that evening at Henry Epstein's saloon, where I had been working that day. I had taken several drinks that day and that night. I never had anything to do with the robbing of Charley Dick, and was not present when it was done and know nothing about it. Myself, Ben Moore, and John Jackson were not in A. Campbell's saloon on the evening of the robbery. I did not see John Jackson in Joe Levy's saloon on that night. I never saw him anywhere that night."

Cross-examination: "I had been working at Henry Epstein's saloon the day preceding the robbery, papering some rooms, and had drank several glasses of beer, and I went to sleep in one of the rooms and staid there until about 12 o'clock that night, when I went to O'Donnell's saloon. I never sold Hugh Cook a set of knives that night. It was three or four days before that when I sold him the knives. I was working for my brother, Ed Thompson, but had been on a spree for two or three days. I had some money that night; not much. I never had anything to do with this robbery and was not present when it was done. I never saw Charley Dick to know him until he was pointed out to me in the court house on the day of the examining trial. I have known John Jackson a long time; we went to school together."

R. J. Goode, for defendant, testified: "My name is R. J. Goode. I am a lawyer by profession; have lived in Waco all my life. Rufus Thompson is my nephew. I met Charley Dick on the morning of the examining trial in this case, on Austin street. I did not know him at that time, and some one pointed him out to me. I was interested in the case, and asked him if Rufus Thompson had anything to do with it. He told me that he did not know Rufus Thompson, and did not know who robbed him. I am positive he told me this."

Cross-examination: Witness was shown by the county attorney his testimony as taken down in the examining trial in this case, and he said: "It is not taken down correctly; I never testified to that, and it is unqualifiedly false. My testimony was not read over to me. If it had been I would not have signed it that way. I did not testify to that in the examining trial. I testified then as I now testify."

John Jackson, the defendant, being sworn, testified: "On the night of the 29th of March, 1890, myself and J. K. Cargil slept together at the Holmes house, in Waco, Texas. We went to bed about 10 o'clock, and never got up until next morning about 8 o'clock. I was not in Joe Levy's saloon on the night that Charley Dick was robbed. I saw Rufe Thompson that evening about 6 o'clock at Henry Epstein's saloon. I did not see either Rufe Thompson or Ben Moore that night at any place. I did not know Ben Moore at that time, and the first time I ever saw him was when I was put in jail charged with this offense. I never had anything to do with robbing Charley Dick, and know nothing about it. I was not present when it was done."

Cross-examination: "I was not doing anything at that time. I have been arrested for theft, burglary, swindling, and robbery. I do not know how many times. The officers arrest me every two or three days for something. I have never been convicted of anything, and have never been sent to the penitentiary. I sometimes worked for my father in his photograph gallery before Charley Dick was robbed. I was not doing anything when he was robbed. I know Rufe Thompson; have known him a long time."

Defendant having introduced portions of the testimony of Charley Dick, taken on the examining trial, for the purpose of contradicting his evidence, the State, over objection of defendant, was permitted to read in evidence the whole of the testimony of this witness as taken at said examining trial. The State read in evidence, over objection of defendant, the following testimony of the defendant's witness, R. J. Goode, for the purpose of contradicting his testimony as set out above:

R. J. Goode, sworn for defendants: "Charles Dick had a conversation with me yesterday morning. He said he had been with all three of them, I think he said at the Congress saloon, and some drinks were taken there when he was in the saloon. I asked him what time of the morning it was. He said it was about 4 o'clock. He did not say who held him. He recognized all three. He said one held him while the other two beat him. He said they were all secreted in the stall, and when they came out it was light, and he recognized them all three."

No briefs found in the record.

DAVIDSON, JUDGE. — Appellant, Thompson, and Moore were jointly indicted for the crime of robbery. Thompson was tried and

acquitted. While testifying in behalf of appellant this fact was sought to be proved by this witness, but, on objection by the State, was rejected. This was error. His complicity in the robbery was kept prominently before the jury throughout the trial. This tended, clearly, to affect and impair the force of his testimony. Proof of his acquittal would have tended to place him in a much more favorable light before the jury, and it was of the greatest importance to appellant that this should be so. When the credibility and standing of a witness have been attacked by evidence that he had been charged with an infamous crime, it certainly is admissible to prove his acquittal of that charge.

Appellant introduced portions of the testimony of Dick, the party charged to have been robbed, taken before the examining court, for the purpose of contradicting or impeaching him. The State was permitted to introduce the whole of his evidence taken on said trial. This testimony is not set out in the bill of exceptions, and it is therefore impossible for us to tell whether it was or was not erroneously admitted. Wilson's Crim. Stats., secs. 2368, 2516. If this testimony was necessary to explain or throw light upon that portion of the evidence used to discredit the witness, it was clearly admissible.

For the purpose of contradicting the witness Goode, the State introduced his testimony taken in the same examining court. Objections were based upon Goode's denial of the correctness of the record offered, and his statement that it was false; that he had not read it before signing it; and that, had it been read to him, he would have declined to sign it. This testimony was, it seems, totally at variance with his evidence on the final trial. For the purpose for which it was used, this testimony was correctly admitted.

On his cross-examination, appellant was made to answer that he had been previously arrested for burglary, robbery, and theft. Exceptions were reserved. A defendant may testify in his own behalf, and this though he may remain unpardoned for conviction of an infamous crime. Williams v. The State, 28 Texas Crim. App., 301; Shannon v. The State, 28 Texas Crim. App., 474; Newman v. The People, 63 Barb., 630; Morgan v. The State, 86 Tenn., 472; Whart. Crim. Ev., 9 ed., sec. 429. He may be contradicted, impeached, and sustained in the same manner, and occupies the same place, and is to be treated as other witnesses. McFadden v. The State, 28 Texas Crim. App., 241; Huffman v. The State, 28 Texas Crim. App., 174; Quintana v. The State, 29 Texas Crim. App., 401; Mendez v. The State, 29 Texas Crim. App., 608; White v. The State, 30 Texas Crim. App., 652; Ferguson v. The State, 31 Texas Crim. Rep., 93. He need not testify —is not compelled to do so—but when he does his credibility is subject to like attacks as other witnesses. Mr. Wharton says: "It has been ruled also, that to affect his credibility he may be asked whether he has been in prison on other charges." Whart. Crim. Ev., 432,

and note 5; McGarry v. The People, 2 Lans., 227; Brandon v. The People, 42 N. Y., 265; Connors v. The People, 50 N. Y., 240; The People v. Casey, 72 N. Y., 393; Quintana v. The State, 29 Texas Crim. App., 401; McFadden v. The State, 28 Texas Crim. App., 241. In Peck's case the Supreme Court of Tennessee said: "Surely the courts would be slow to place a construction upon an act of the Legislature (if there were room for construction) that would allow a witness to be sworn, and give his testimony against that of a good and true man, when the State's attorney knows and is ready to prove him wholly devoid of moral sense and utterly unworthy of belief, and at the same time prevent the State from showing the character of the witness, as affecting his credit. Under this act, a man repeatedly convicted of the crime of perjury can go before the jury, in a community where he is unknown, and, with a good manner and fair exterior, give evidence in his own behalf, and the State remain powerless to impeach him, if the position contended for were tenable. Prior conviction of an infamous crime does not incapacitate him as a witness." 6 So. W. Rep., 390, 391. He may be asked "whether he has suborned testimony in the particular case, and whether he has been concerned in other crimes, part of the same system." Whart. Crim. Ev., 432, and notes.

The decisions are practically harmonious to the effect that the defendant as a witness occupies the same position as any other witness; is liable to be cross-examined as to any matter pertinent to the issues of the trial; may be contradicted, impeached, and sustained as any other witness, and is subject to the same tests. See Quintana v. The State, supra, for collated authorities. This court after mature deliberation held, that the credibility of a witness can be attacked by evidence that he has been charged with the commission of an infamous offense, or that he has been arrested for a crime involving legal and moral turpitude. Carroll v. The State, 32 Texas Crim. Rep., 431; Goode v. The State, 32 Texas Crim. Rep., 505; Lights v. The State, 21 Texas Crim. App., 308; see also The People v. Rodrigo (Cal.), 11 Pac. Rep., 481; Hollingsworth v. The State (Ark.), 14 So. W. Rep., 41. The status of the accused as a witness being determined and fixed as other witnesses, it would follow, under the rule laid down in the Carroll case, that he is subject to the same rules and tests. The decisions are hardly reconcilable upon any other theory. Again, every witness is presumed to be truthful. This presumption, like all presumptions, may be overcome. This presumption applies alike to all the witnesses who testify. It would hardly be asserted that the presumption of truthfulness does not apply to the accused, for this would abrogate the rule that he stands upon the same equality with the other witnesses. If he is presumed untruthful it would be wholly unnecessary to attack his credibility, and his evidence would be wholly unnecessary and worthless, and the statute authorizing his testimony

worse than foolishness. Or, if he be exempt from the same attack as the other witnesses, then to that extent the presumption of truthfulness becomes conclusive, and therefore binding upon the courts and juries. The law, however humane in guarding the rights of the accused while on trial, certainly did not intend to clothe the presumption of his truthfulness in any particular with an unapproachable and inviolable sanctity. Again, it is permissible, when tending to establish identity, intent, or to develop the res gestæ, to prove contemporaneous crimes. And this may also be done when the object is to show system. Hennessey v. The State, 23 Texas Crim. App., 340; Whart. Crim. Ev., 9 ed., 38. These matters may be shown by any competent evidence or witness—even by the defendant himself. Id., 432., and notes. In such state of case, the purpose of such proof must be explained to the jury in the charge of the court. It would seem that when such evidence is admitted for the purpose indicated, the charge limiting its purpose is required in order to prevent a conviction of an offense for which the accused is not then being prosecuted. So, if the accused is required to testify to such facts, either as original evidence or to affect his credit as a witness, the court should give appropriate instructions and inform the jury as to the purpose of admitting the testimony. When such testimony is sought only for the purpose of impugning the standing of the witness, and is denied by him, the answer is usually binding, and the party eliciting the answer is in general precluded from contradicting the witness as regards that particular question. As was said in Carroll's case: "It is also to be observed, that when a witness is asked a question which tends to disgrace him, and he answers that question, the cross-examining party is in general bound by the answer, if collateral to the issue, and only going to the credit of the witness, for to admit contradicting evidence would raise collateral and independent issues not relevant to the main question." 32 Texas Crim. Rep., 431; 1 Greenl. on Ev., 455; Best on Ev., 100; 2 Phil. on Ev., 950. The evidence was correctly admitted, and the court in the charge properly limited it to the office and purpose for which it was admitted.

The court should have omitted the charge given in relation to the use of deadly weapons. This means of committing the robbery was not averred.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, concurs.

### DISSENTING OPINION.

SIMKINS, JUDGE.—While I agree to the disposition of the case upon the other grounds, I am unable to concur with the majority of the court in holding, that when the defendant takes the stand in his

own behalf he thereby subjects himself to cross-examination to the same extent and in the same manner as any other witness. I readily concede he may be cross-examined as to all matters connected with the offense charged, or as to crimes contemporaneous or connected by system with the one under investigation; but I deny the right of the State to go, under claim of attacking his credibility, into the witness' past life, and bring before the jury charges and convictions having no relation to, nor connection with, the present charge. The distinguishing feature of the common law, from which our Criminal Code is derived, was its great solicitude lest the innocent should suffer. Not only was the specific accusation to be distinctly charged, and the defendant confronted with his accusers, but the testimony was required to be weighed by an unprejudiced and impartial jury, charged to regard him as an innocent man until the crime charged was proven beyond a reasonable doubt. Yet to admit testimony of the character above mentioned is to strip the defendant of the presumption of innocence the law has heretofore thrown about him, and renders his conviction a certainty in cases where doubt might otherwise exist. It is beyond the power of a trial judge to admit such testimony, and then control its effect on the minds of the jury by limiting it simply to impeachment. I have no doubt as to the correctness of the rule which permits a witness testifying for or against another person charged with crime to be examined as to his past life, so far as it may throw light on his present character for truth. The jury should know his surroundings and connections, to properly weigh his testimony. Carroll's case, 32 Texas Crim. Rep., 431. There is, however, a manifest difference, as to result, between the ordinary witness and the defendant witness. The ordinary witness has but his credibility at stake. Proof of his past life can alone affect that. But the defendant witness has at stake not only his credibility but his liberty or life, and the testimony, under this rule of the court, may not only break down his credibility but take away his life also. Nor does it follow, if such testimony is not admitted, that the presumption of truthfulness will surround the accused. On the contrary, there is no possibility of the jury forgetting that defendant is profoundly interested in the cause, with every incentive to conceal the truth if it is against himself; and defendant necessarily labors under a disadvantage that can attend no other witness. For these reasons, I do not think the rule in the Carroll case should be extended to defendant's testifying.